# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LISA R. MORROW, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| FRONTIER COMMUNICATIONS CORPORATION, DANIEL J. MCCARTHY, RALPH PERLEY MCBRIDE, JOHN M. JURELLER and DONALD W. DANIELS, | ) ) ) ) ) |
| Defendants. | ) ) |

**Case No.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Lisa R. Morrow ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Frontier Communications Corporation ("Frontier" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Frontier securities between February 6, 2015, and May 2, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Frontier provides communications services in the United States, including broadband, video, and voice services. Founded in 1927, the Company is headquartered in Norwalk, Connecticut.  Frontier's stock trades on the NASDAQ stock market under the ticker symbol "FTR."

3.      On February 5, 2015, the Company announced a definitive agreement to acquire the wireline operations of Verizon Communications, Inc. (the "Verizon Acquisition") in California, Texas and Florida for a purchase price of $10.54 billion in cash and assumed debt. At the release of the news, over the course of a week, the price per share of Frontier common stock increased more than 8.7% from an adjusted close of $115.50 on February 5, 2015, to an adjusted close of $125.55 on February 12, 2015[1].

4.      Throughout the Class Period defendants allegedly failed to disclose the underperformance of the Verizon Acquisition. Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company

---

[1] On July 10, 2017, the Company completed a 1-for-15 reverse stock-split. As a result, each fifteen shares of Frontier common stock were automatically converted into one share of common stock, without any change in the par value per share. Unless otherwise noted, the stock prices are adjusted to the stock split.

acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon Communications, Inc.; (ii) as a result, the Company would be required to increase its reserves, and write-off amounts from accounts receivable associated with the non-paying accounts; and (iii) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times.

5.    On February 27, 2017, the Company disclosed a net loss of $80 million for the fourth quarter of 2016, and stated that its results were impacted by the "resolution of nonpaying acquired CTF accounts." Chief Executive Officer ("CEO") Daniel J. McCarthy ("McCarthy") elaborated, stating: "Results for the fourth quarter were impacted by our intensified efforts to resolve acquired accounts in California, Texas and Florida that we have determined to be non-paying."

6.    On that same day, February 27, 2017, the Company held a conference call to discuss its financial results. On the call, Defendant McCarthy stated that the Company had been working through the account cleanup process since July 20, 2016, that the Company began disconnecting non-paying accounts at the end of August 2016, and that the disconnects continued through the first quarter of 2017. McCarthy further stated that the Company began to reserve aging accounts in accordance with in normal policies in Q2 2016 and then increased its reserves. Finally. McCarthy stated that the Company began permanent disconnects and receivable write-offs in the third quarter of 2016, and continued them in the fourth quarter of 2016.

7.    On this news, the Company's stock price fell $6.30 per share, almost 11%, to close at $43.95 per share on February 28, 2017, on unusually heavy trading volume.

8.    On May 2, 2017, the Company reported a first quarter 2017 net loss of $75 million and a year-over-year first quarter revenue decline of $53 million. On the same day, the Company

held a conference call to discuss its first quarter financial results. On the call, Chief Financial Officer Ralph Perley McBride ("McBride") stated that approximately $16 million of the sequential revenue decline was a result of cleanup of CTF non-paying accounts and the automation of legacy non-pay disconnects. Specifically, he stated that "The CTF account cleanup reduced Q1 revenue by $11 million, and the one-time impact related to automating the non-pay disconnect process for the legacy properties, reduced Q1 revenue by $5 million."

9.    On this news, the Company's stock price fell $4.8 per share, or more than 16%, to close at $24.15 per share on May 3, 2017, on unusually heavy trading volume.

10.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## Jurisdiction and Venue

11.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

13.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, Frontier's principal executive offices are located within this Judicial District.

14.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## Parties

15.    Plaintiff, as set forth in the attached Certification, acquired Frontier securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.    Defendant Frontier is incorporated in Delaware, with principal executive offices located at 401 Merritt 7, Norwalk, Connecticut 06851.  Frontier's shares trade on the NASDAQ under the ticker symbol "FTR."

17.    Defendant Daniel J. McCarthy has served at all relevant times as the Company's CEO.

18.    Defendant Ralph Perley McBride served as the Company's Chief Financial Officer ("CFO") from November 4, 2016 through the end of the Class Period.

19.    Defendant John M. Jureller ("Jureller") served as the Company's CFO from January 2013 to November 4, 2016.

20.    Defendant Donald W. Daniels ("Daniels") has served at all relevant times as the Company's Senior Vice President and Controller.

21.    The Defendants referenced above in ¶¶ 17-20 are sometimes referred to herein as the "Individual Defendants."

22.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control, the contents of Frontier's reports to the SEC, press releases and

presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.    Frontier purportedly provides communications services in the United States, including broadband, video, and voice services.

### Materially False and Misleading Statements Issued During the Class Period

24.    The Class Period begins on February 6, 2015. On February 5, 2015, after the market closed, Frontier issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing a definitive agreement to acquire Verizon Wireline Operations in California, Texas and Florida ("February 2015 Press Release"). The press release stated in relevant part:

> STAMFORD, Conn.--(BUSINESS WIRE)-- Frontier Communications Corporation (NASDAQ:FTR) is today announcing a definitive agreement with Verizon Communications Inc. (NYSE:VZ) under which Frontier will acquire Verizon's wireline operations that provide services to residential, commercial and wholesale customers in California, Florida and Texas, for $10.54 billion in cash. These Verizon properties include 3.7 million voice connections, 2.2 million broadband connections, and 1.2 million FiOS® video connections. The network being acquired is the product of substantial capital investments by Verizon and is 54 percent FiOS enabled. Subject to regulatory approval, the transaction is expected to close in the first half of 2016.

6

"This transaction marks a natural evolution for our company and leverages our proven skills and established track record from previous integrations," said Maggie Wilderotter, Frontier Communications Chairman and Chief Executive Officer.

"***These properties are a great fit for Frontier and will strengthen our presence in competitive suburban markets and accelerate our recent market share gains. We look forward to realizing the benefits this transaction will bring to our shareholders, customers and employees***."

Lowell C. McAdam, Chairman and Chief Executive Officer of Verizon, said, "This transaction will further strengthen Verizon's focus on extending our leadership position in our core markets and create value for both Verizon and Frontier shareholders. Frontier has proven to be an excellent partner. Together we will ensure a smooth transition for our customers and employees, and I have no doubt these teams will continue putting the customer first."

Dan McCarthy, Frontier's President and Chief Operating Officer, commented, "This transaction is an exciting opportunity for Frontier. We are well-positioned to maximize value for our shareholders and create a great experience for new customers. We have four FiOS markets today from our 2010 transaction with Verizon, and a high level of familiarity with the systems underlying these properties. We plan to flash-cut convert these properties to Frontier's systems as we did in states including West Virginia and Connecticut."

The transaction provides substantial benefits, including:

**Strong Revenues, Accretion to Free Cash Flow and Dividend Sustainability:** The Verizon wireline operations being acquired by Frontier generated revenue of more than $5.7 billion in 2014. As a result of certain Verizon-allocated overhead costs not transferring to Frontier, or being replaced by Frontier's lower cost structure, Frontier expects costs to be reduced by $525 million in the first year after close and $700 million by year three. Frontier expects the transaction to be 35 percent accretive to free cash flow per share in year one and to improve Frontier's strong dividend payout ratio by 13 percentage points.

**Delivers Significant Customer Benefits:** Frontier expects a smooth transition for customers in its new markets. Frontier will extend its local engagement model of being active in the communities it serves and provide superior levels of customer service and differentiated offerings.

**High-Quality Assets:** Verizon has invested more than $7 billion in the buildout of FiOS in the acquired territories, which now enjoy a high availability of FiOS services: fully 54 percent of the acquired network is FiOS enabled.

**Tax Structure:** The transaction will be structured as an asset purchase for tax purposes; with an estimated net present value benefit of approximately $1.9 billion to Frontier and its shareholders.

**Transaction Details, Terms and Approvals**

Under the terms of the transaction, Frontier will pay Verizon $10.54 billion in cash at closing, representing 3.7x 2014E Pro Forma Day 1 EBITDA.

Frontier will finance this acquisition with the issuance of a combination of equity and equity-linked securities, as well as debt. Frontier has secured a commitment for bridge financing from J.P. Morgan, Bank of America Merrill Lynch and Citibank for 100 percent of the purchase price. The transaction is not subject to a financing condition.

The transaction is subject to regulatory approvals and customary closing conditions, including review by the U.S. Federal Communications Commission, the U.S. Department of Justice, and certain governmental authorities in the states covered. The transaction is expected to close in the first half of 2016.

Emphasis added.

25.    On February 19, 2015, during a conference call to discuss the Company's financial and operating results for the fourth fiscal quarter and year ended December 31, 2014 ("Q4 2014 Conf. Call"), Frontier Communications' Chief Operating Officer stated in relevant part:

Everyone in the company is excited by the news of our plans to acquire markets in California, Florida, and Texas. This represents a phenomenal opportunity for our employees to take on new challenges and ***we are confident that this transaction will be very rewarding for our shareholders too.***

Emphasis added.

26.    During the same conference call, Frontier Communications' Chief Financial Officer stated in relevant part:

Before we pass the call back for your questions, let me reiterate a few of the key points of our recently announced $10.54 billion transaction with Verizon for the acquisition of their wireline properties in California, Texas and Florida. This is a transformative opportunity, one that meaningfully enhances our long-term competitive position. Further, it significantly enhances shareholder value.

On a pro forma basis, we estimate that in the first full year, this will add approximately $5.4 billion of revenue and $2.3 billion of adjusted day one EBITDA. Total new Frontier revenue and EBITDA will be approximately $11.7 billion and $4.9 billion respectively. We estimate that this transaction will be 35% accretive to our leveraged free cash flow per share and lower our dividend payout ratio by 13 percentage points in the first full year.

We are comfortable with a pro forma leverage with our financing plans allowing us to maintain our corporate and unsecured debt ratings. We currently estimate being in the public markets in the second half of 2015 with our capital raising plans that include approximately $3 billion of equity and $8 billion of debt. We will be opportunistic in completing our financing prior to the estimated first half 2016 completion of this transaction.

27.    On August 3, 2015, during a conference call to discuss the Company's financial and operating results for the second fiscal quarter ended June 30, 2015 ("Q2 2015 Conf. Call"), Frontier Communications' President and CEO stated in relevant part:

*The Verizon acquisition will transform Frontier*. As you can see from the pie charts on the slide, with the addition of the Verizon markets, residential voice revenues will constitute less than 20% of Frontier's pro forma revenue based on 2014 run rates. Likewise, wireless backhaul revenues from the continuing Frontier territories will comprise only about 2% of overall revenues, making any future declines less consequential.

We will also gain a substantially and large FiOS footprint and much greater scale. *This transaction increases Frontier's growth profile and reduces our exposure to declining portions of our business, improving our business mix significantly*. Another benefit of this transaction is the technology refresh that we will enjoy for our existing FiOS markets. We are currently finalizing our plans to introduce this new technology in these FiOS markets in Q4. The new FiOS platform, an existing Verizon pricing and bundles, will become the new standard for our current FiOS markets later this year. This will allow us to have three months to six months of operation of the refreshed platform prior to integration of the new states. We will utilize this time to get our team very comfortable with the new features, functionality and business processes needed to support the current FiOS platform, and then we will continue the exact Verizon pricing and bundle construction in the new markets following conversion. As a result, we will not see the migration impact we saw in Connecticut in Q1.

This conversion change will reduce training requirements of transferring employees, maintain the effectiveness of alternate channel partners, and most importantly, *prevent the possibility of revenue declines associated with bundle migration as we experienced in Connecticut*. *We continue to anticipate significant synergies as we substitute Frontier's lower cost structure for Verizon's.*

The Frontier team is working to deliver at or above synergies and EBITDA levels that we have communicated. The key driver of our synergies is the elimination of the Verizon expense allocations. As we approach the midpoint of our integration efforts, we remain highly confident in delivering on pro forma financial projections.

We continue to estimate that the completion of the Verizon transaction will provide over 30% accretion to leverage free cash flow per share in the first full year, and will result in a solid improvement to our dividend payout ratio.

Emphasis added.

28.     On November 3, 2015, during a conference call to discuss the Company's financial

and operating results for the first fiscal quarter ended September 30, 2015 ("Q1 2015 Conf. Call"),

Frontier Communications' President and CEO stated in relevant part:

> Most importantly, ***I want to assure you that I am fully confident that we will achieve and even exceed the synergy targets we have outlined for Frontier post-close of the Verizon transaction.*** Furthermore, we also will have identified opportunities to improve efficiencies in our existing business post-closing through the application of new technologies that we are developing as part of the Verizon integration. We anticipate that this will result in an incremental improvement to our expenses.
>
> Please turn to slide four. Let me turn to a quick update on our Verizon transaction. As you know, the Verizon acquisition will transform Frontier significantly, materially transitioning Frontier's revenue to a more diversified mix with better growth prospects. Our integration teams continue to work diligently, and we remain confident that we will be ready for closing on March 31, 2016.
>
> Financing is completely in place, regulatory approvals are nearly complete with one pending. Union agreements have been reached, and integration is on track. I would like to provide more details on the integration process and our current status.
>
> First, we now have completed all integration project plans that detail all responsibilities and critical paths in transitioning the network traffic from Verizon's network onto ours. Also covered is the system conversion as well as customer data migration. This is a highly complex process and attention to detail is critical. Our goal is flawless execution.
>
> In this regard, I am very pleased to report that we have had the successful completion of our first mock data conversion. This process is off to a great start. We will have several more before we are ready to close, and our internal results are ahead of our expectations.
>
> In terms of IT, we are continuing to put in place the necessary features and capabilities to handle the new market. This touches all elements of the business, handling dramatically expanded customer data, processing twice the number of monthly bills, and supporting double the number of employees.

Emphasis added.

29.    On April 1, 2016, Frontier issued a press release, also attached as exhibit 99.1 to

the Form 8-K filed with the SEC announcing the completion of the acquisition of Verizon Wireline

Operations in California, Texas and Florida.  Therein, the Company stated in pertinent part:

**Frontier Communications Completes Acquisition of Verizon Wireline Operations in California, Texas and Florida**

**NORWALK, Conn., April 1, 2016** - Frontier Communications Corporation (NASDAQ: FTR) today announced completion of its $10.54 billion acquisition of Verizon Communications, Inc. (NYSE: VZ) wireline operations providing services to residential, commercial and wholesale customers in California, Texas and Florida. The acquired businesses include approximately 3.3 million voice connections, 2.1 million broadband connections, and 1.2 million FiOS® video subscribers, as well as the related incumbent local exchange carrier businesses. New customers will begin receiving monthly bills starting in mid-April.

"This is a transformative acquisition for Frontier that delivers first-rate assets and important new opportunities given our dramatically expanded scale," said Daniel J. McCarthy, Frontier's President and Chief Executive Officer. "It significantly expands our presence in three high-growth, high-density states, and improves our revenue mix by increasing the percentage of our revenues coming from segments with the most promising growth potential."

Frontier is pleased to welcome from Verizon approximately 9,400 employees. "Our new colleagues know their markets, their customers and their business extremely well," McCarthy said. "As valued members of the Frontier team, they will ensure continuity of existing customer relationships."

30.    On May 3, 2016, the Company issued a press release, also attached as exhibit 99.1

to the Form 8-K filed with the SEC, entitled "Frontier Communications Reports 2016 First Quarter

Results." Therein, the Company, in relevant part, stated:

Norwalk, Conn., May 3, 2016 — Frontier Communications Corporation (NASDAQ: FTR) today reported that it achieved solid first quarter results while preparing for the industry's largest and most complex flashcut conversion in its new California, Texas and Florida markets. The flashcut conversion was executed on April 1, and the Company will begin to realize financial results from its newly combined business in the coming quarters.

"We see enormous opportunity in these new markets with millions of new customers," said Dan McCarthy, Frontier President and Chief Executive Officer. "In addition to increased scale, these areas are each very attractive with significant growth potential. After a month of operating these properties, we are very pleased

with the progress we have made and we want to thank customers for their patience during the transition period. The entire Frontier team remains focused on cultivating growth by retaining and attracting new customers. We will continue to drive Frontier's performance to maintain free cash flow that provides an attractive and sustainable dividend payout ratio."

Frontier reported first quarter 2016 revenue of $1,355 million, operating income of $58 million and net loss of $186 million, or $0.16 per share. Excluding acquisition related interest expense of $188 million and acquisition and integration costs of $138 million (combined after-tax impact of $200 million, or $0.17 per share), non-GAAP adjusted net income was $14 million, or $0.01 per share, for the first quarter of 2016 (See attached Schedule B).

**Total revenue** for the first quarter of 2016 was $1,355 million. This represents a sequential decline of $58 million, or 4%, from the $1,413 million reported in the fourth quarter of 2015, primarily resulting from a one-time sequential decline of $40 million in the recognition of regulatory revenue that was in line with previously disclosed expectations and a decline in voice services revenue. Frontier recognized Connect America Fund Phase II (CAF II) revenue for the first time in the second half of 2015, resulting in the majority of the full year CAF II revenue being recognized in the third and fourth quarters of 2015.

**Customer revenue** for the first quarter of 2016 of $1,189 million decreased by $18 million, or 1%, from $1,207 million in the fourth quarter of 2015, primarily due to a decline in voice services revenue. Total residential revenue was $583 million for the first quarter of 2016, compared to $594 million in the fourth quarter of 2015. Total business revenue was $606 million for the first quarter of 2016, compared to $613 million in the fourth quarter of 2015.

At March 31, 2016, Frontier had 3,088,300 residential customers. The first quarter of 2016 resulted in a net reduction of 1.1% of our residential customers, compared to a net reduction of 0.7% in the fourth quarter of 2015.  The average monthly residential revenue per customer was $62.64 in the first quarter of 2016, a decrease of $0.50, or 0.8%, compared to the fourth quarter of 2015, due to the decline in voice services revenue.

At March 31, 2016, Frontier had 284,400 business customers. The first quarter of 2016 resulted in a net reduction of 1.7% of our business customers, similar to the fourth quarter of 2015. The average monthly business revenue per customer was $704.10, an increase of 0.6% over the fourth quarter of 2015, as the business customer decline continued to be driven by a decrease in the number of small business customers.

At March 31, 2016, Frontier had 2,486,700 broadband customers. We added 24,600 net broadband customers during the first quarter of 2016 compared to 28,500 net additions in the fourth quarter of 2015.

At March 31, 2016, Frontier had 543,400 video customers. The first quarter of 2016 resulted in a net reduction of 10,300 video customers, including a reduction of 6,700 satellite video customers, compared to the fourth quarter net reduction of 5,800 video customers, including a reduction of 5,400 satellite video customers.

*        *        *

**Acquisition and integration costs** for the first quarter of 2016 were $138 million related to the Verizon transaction compared to $86 million in the fourth quarter of 2015.

**Operating income** for the first quarter of 2016 was $58 million and operating income margin was 4.3% compared to operating income of $182 million and operating income margin of 12.9% in the fourth quarter of 2015.

*        *        *

**Net income/loss** was a net loss of $186 million, or $0.16 per share, in the first quarter of 2016, compared to a net loss of $103 million, or $0.09 per share, in the fourth quarter of 2015. The first quarter of 2016 included acquisition related interest expense of $188 million and acquisition and integration costs of $138 million (combined after-tax impact of $200 million, or $0.17 per share). Excluding the impact of these items, the non-GAAP adjusted net income for the first quarter of 2016 was $14 million, or $0.01 per share, as compared to $56 million, or $0.05 per share, in the fourth quarter of 2015.

**Capital expenditures** for ongoing operations were $207 million for the first quarter of 2016 compared to $185 million for the fourth quarter of 2015.  In addition, acquisition related capital expenditures were $52 million in the first quarter of 2016, similar to the fourth quarter of 2015.

*        *        *

**2016 Full Year Guidance**

For the full year of 2016 including the impact of the California, Texas, and Florida acquisition, Frontier's expectation for adjusted free cash flow (as calculated per Schedule A) is in the range of $800 million to $925 million and for **capital expenditures** for Frontier's combined operations is in the range of $1,250 million to $1,400 million. Frontier expects 2016 cash taxes to be in the range of $5 million to $15 million.

31.     On May 5, 2016, Frontier filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  The Q1 2016 10-Q contained signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX") by Defendants McCarthy and Jureller, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.    On August 1, 2016, the Company issued a press release entitled "Frontier Communications Reports 2016 Second Quarter Results." Therein, the Company, in relevant part, stated:

> Norwalk, Conn., August 1, 2016 — Frontier Communications Corporation (NASDAQ:FTR) today reported its financial results for the second quarter of 2016, which include contributions from the fully integrated assets Frontier acquired from Verizon in California, Texas, and Florida (CTF).
>
> "We are very pleased with the performance of our newly acquired assets and our achievement of annualized cost synergies of $1 billion in the second quarter. We now expect annual cost synergies related to the acquisition of $1.25 billion, up from our original estimate of $700 million," said Dan McCarthy, Frontier President and Chief Executive Officer.
>
> "As we move forward, we are continuing to focus on executing our strategy for growth, including upgrading our broadband speed capabilities, expanding our new Vantage video service to an increasing portion of our footprint, and implementing our successful commercial distribution capabilities in Frontier's new markets.  We will remain focused on increasing our broadband and video penetration, and improving our efficiency.  Our priorities continue to be driving strong free cash flow and continuing our disciplined capital allocation policy, which together underpin our very attractive, sustainable dividend, and industry-leading dividend payout ratio.  We also are very well-positioned to achieve our plan to reduce leverage over time," McCarthy said.
>
> Financial Highlights for the Second Quarter 2016:
>
> - Revenue of $2,608 million
> - Operating income of $311 million, operating income margin of 11.9%
> - Net loss of $80 million, or ($0.07) per share
> - Adjusted EBITDA of $1,032 million, adjusted EBITDA margin of 39.6%
> - Net cash provided from operating activities of $693 million
> - Adjusted Free Cash Flow of $250 million

Revenue:

| | For the quarter ended | | | | |
| | June 30, 2016 | | | | |
| (*$ in millions*) | Consolidated Amount | CTF Operations | Frontier Legacy* | March 31, 2016 | June 30, 2015 |
|---|---|---|---|---|---|
| Total revenue | $ 2,608 | $ 1,282 | $ 1,326 | $ 1,355 | $ 1,368 |

Revenue in the second quarter of 2016 associated with the CTF Operations reflected certain reductions to revenues previously reported for the business, including revenue that did not transfer over from Verizon and strategic decisions to terminate certain contracts and services which, while lowering revenues, added to EBITDA. Revenues were also impacted by one-time items, including the temporary suspension of late fees, outage credits and the anticipated acquisition-related accounting changes.  Also, as previously announced, the Company temporarily suspended marketing activity which impacted customer additions. Mr. McCarthy commented, "We are pleased that the EBITDA from the acquired operations met our expectations for the quarter as a result of better-than-expected cost synergies, and despite our strategic decision to forego specific revenue opportunities."

Customers:

| | As of and for the quarter ended | | | |
| | June 30, 2016 | | June 30, 2015 | |
|---|---|---|---|---|
| **Residential customer metrics:** | | | | |
| Customers (in thousands) | | 5,243 | | 3,175 |
| Average monthly residential revenue per customer | $ | 83.20 | $ | 64.43 |
| Customer monthly churn | | 1.91% | | 1.78% |
| **Business customer metrics:** | | | | |
| Customers (in thousands) | | 528 | | 299 |
| Average monthly business revenue per customer | $ | 658.00 | $ | 689.21 |
| **Broadband subscribers (in thousands)** | | 4,570 | | 2,406 |
| **Video subscribers (in thousands)** | | 1,628 | | 569 |

The broadband and video unit results during the second quarter reflect Frontier's previously-stated plans to suspend marketing during the second quarter to prospective new customers in the acquired CTF markets, enabling Frontier to focus its efforts on supporting existing customers in those markets.  Marketing spending and engagement have now returned to normal levels and the Company anticipates improved customer additions in the third quarter and beyond.  Residential ARPC increased during the second quarter largely as a result of the greater availability of video in the new CTF markets. Business ARPC decreased primarily due to the CTF markets having proportionally fewer wholesale customers relative to total business customers as compared to our legacy markets.

15

<u>Integration Costs:</u>

Frontier completed its CTF customer conversion activities in the second quarter and is finalizing the remainder of its integration work. During the second quarter, Frontier incurred $106 million of integration operating expenses and $36 million of integration capital expenditures. These costs were driven by cutover activities and the acceleration of certain projects to improve synergy attainment.

<u>Cash Flow Highlights</u>:

|  | For the quarter ended | |
|  | June 30, 2016 | June 30, 2015 |
| --- | --- | --- |
| Capital expenditures – business operations | $ 350 | $ 178 |
| Capital expenditures – integration activities | $ 36 | $ 28 |
| Dividends paid – preferred stock | $ 53 | $ - |
| Adjusted free cash flow[] | $ 250 | $ 200 |
| Dividends paid – common stock | $ 123 | $ 106 |
| Dividend payout ratio[4] | 49% | 53% |

<u>Guidance</u>:

For the full year 2016, Frontier expects:

- Adjusted free cash flow (as calculated per Schedule A) to be in the range of $825 million to $900 million[]
- Capital expenditures to be in the range of $1,275 million to $1,325 million
- Cash taxes refunds to be in the range of $10 million to $20 million
- Cash contributions to the pension plan to be in the range of $10 million to $15 million.

- For the full year 2017, Frontier expects adjusted EBITDA to be greater than $4 billion.

33.    On August 8, 2016, the Company filed its quarterly report on Form 10-Q for the 2016 fiscal second quarter. The 10-Q was signed by Defendant Daniels, and reaffirmed the Company's statements about its financial results contained in the press release issued on August 1, 2016.

34.    On November 1, 2016, the Company issued a press release entitled "Frontier Communications Reports 2016 Third Quarter Results." Therein, the Company, in relevant part, stated:

Norwalk, Conn., November 1, 2016 — Frontier Communications Corporation (NASDAQ:FTR) today reported its third quarter financial results and provided an update on its progress with the acquisition of Verizon's wireline properties in California, Texas, and Florida (CTF).

Dan McCarthy, President and CEO, stated, "I am pleased that we achieved third quarter adjusted EBITDA of $1 billion. We are reaffirming our adjusted EBITDA

guidance for the 4th quarter and outlook for 2017.  We are on course to improve our revenue performance, principally by returning to normal customer trends in the CTF market over the coming quarters."

Frontier today announced a new customer-focused organizational structure and the creation of Commercial and Consumer business units.  The updated structure will result in enhanced focus on the commercial segment and more efficient capital allocation.  Current regional support functions including Engineering, Finance, Human Resources, Communications and Marketing are being centralized to achieve improved operational performance as well as expense reductions.

Frontier's annualized cost synergy target is now $1.4 billion, up from the $1.25 billion target outlined in the second quarter earnings report. Yet-to-be attained cost synergies of $400 million are anticipated to be achieved by mid-year 2019, including $250 million anticipated to be achieved by mid-year 2017.

Frontier's priorities continue to be driving strong free cash flow and continuing a disciplined capital allocation policy. Frontier is committed to maintaining an attractive dividend, preserving its industry-leading dividend payout ratio, and reducing leverage.

Financial Highlights for the Third Quarter 2016:

- Revenue of $2,524 million
- Operating income of $264 million, operating income margin of 10.5%
- Net loss attributable to common shareholders of $134 million, or ($0.12) per share, and net loss of $80 million
- Adjusted EBITDA of $1 billion, adjusted EBITDA margin[2] of 39.6%
- Net cash provided from operating activities of $321 million
- Adjusted Free Cash Flow[3] of $168 million

Revenue:

| ($ in millions) | For the quarter ended | | | | | |
| | September 30, 2016 | | | June 30, 2016 | | |
| | Consolidated Amount | CTF Operations | Frontier Legacy | Consolidated Amount | CTF Operations | Frontier Legacy |
| --- | --- | --- | --- | --- | --- | --- |
| Total revenue | $    2,524 | $    1,212 | $    1,312 | $    2,608 | $    1,282 | $    1,326 |

Revenues from CTF Operations were impacted by a slower than expected recovery of FiOS® gross additions and an increased accounts receivable reserve associated with the resumption of normal customer collection activities. In addition, second quarter results included the one-time benefit of a true-up of CAF II revenues for the acquired states that did not recur in the third quarter.

Customers:

| | As of and for the quarter ended | | | |
| --- | --- | --- | --- | --- |
| | September 30, 2016 | | June 30, 2016 [4] | |
| **Residential customer metrics:** | | | | |
| Customers (in thousands) | | 5,073 | | 5,228 |
| Average monthly residential revenue per customer | $ | 82.34 | $ | 83.20 |
| Customer monthly churn | | 2.08% | | 1.91% |
| **Business customer metrics:** | | | | |
| Customers (in thousands) | | 516 | | 528 |
| Average monthly business revenue per customer | $ | 668.30 | $ | 658.00 |
| **Broadband subscribers (in thousands)** | | 4,404 | | 4,503 |
| **Video subscribers (in thousands)** | | 1,526 | | 1,618 |

The broadband and video unit results during the third quarter reflected the initiation of customer acquisition activities within the quarter in the acquired CTF markets. Frontier anticipates improved customer additions in the fourth quarter.

Integration Costs:

During the third quarter, Frontier incurred $122 million of integration operating expenses and $11 million of integration capital expenditures.

Guidance:

For the full year 2016, Frontier expects:

- Adjusted Free Cash Flow – between $920 million and $950 million
- Capital Expenditures – between $1,250 million and $1,275 million
- Cash Taxes – refund between $100 million and $110 million

For the fourth quarter of 2016, Frontier expects:

- Adjusted EBITDA – at least $1 billion

35.     On November 3, 2016, the Company filed its quarterly report on Folio 10-Q for the 2016 fiscal third quarter. The 10-Q was signed by Defendant Daniels, and reaffirmed the Company's statements about its financial results contained in the press release issued on November 1, 2016.

36.     On February 27, 2017, the Company issued a press release entitled "Frontier Communications Reports 2016 Fourth Quarter and Full Year Results." Therein, the Company disclosed a net loss of $80 million for the fourth quarter of 2016, and stated that its results were impacted by the "resolution of non-paying acquired CTF accounts." Defendant McCarthy elaborated, stating: "Results for the fourth quarter were impacted by our intensified efforts to

resolve acquired accounts in California, Texas and Florida that we have determined to be nonpaying." In greater part, the Company stated in the press release:

- Adjusted EBITDA1 of $966 million and net loss of $80 million in the fourth quarter
- Full-year adjusted free cash flow2 of $921 million, with full year net cash provided by operating activities of $1,666 million
- Fourth quarter results impacted by resolution of non-paying acquired CTF accounts
- Improved trend in broadband in both Legacy and CTF markets, excluding impact of non-paying account resolution
- Increased annualized cost synergy target to $1.6 billion, with $1.25 billion to be realized by end of Q1 2017, and $1.6 billion by end of Q2 2018
- Amended April 2021 term loan and revolver to provide more flexible terms, and upsized and extended revolver
- Board of Directors approved and will recommend to stockholders a reverse stock split
- Dividend payout ratio3 of 52% in 2016
- Provides 2017 guidance for adjusted free cash flow, capital expenditures, and cash taxes

Norwalk, Conn., February 27, 2017 – Frontier Communications Corporation (NASDAQ:FTR) today reported its fourth quarter and full year 2016 results and provided an update on its progress with its wireline properties acquired from Verizon in California, Texas, and Florida.

Dan McCarthy, President and CEO, stated, "During the quarter we made significant progress in positioning our company to deliver a better customer experience and improved financial performance, with greater financial flexibility. Our reorganization into separate Commercial and Consumer business units will result in a more customer-centric approach, while reducing expenses and enabling more efficient capital deployment. We now expect annualized cost synergies of $1.6 billion to be achieved by mid-year 2018, up from the $1.4 billion target outlined in the 2016 third quarter earnings report, and a full year earlier than anticipated. We expect $1.25 billion of the $1.6 billion in synergies will be achieved by the end of the first quarter of 2017, which is a quarter earlier than previously announced."

Mr. McCarthy continued: "Results for the fourth quarter were impacted by our intensified efforts to resolve acquired accounts in California, Texas and Florida that we have determined to be non-paying. This process is almost complete, and we expect to return to a normalized trend by the start of the second quarter. I am pleased

that underlying CTF customer trends improved in Q4 and continue to improve in Q1."

McCarthy continued, "We are taking action to adapt our organization to the opportunities created by the increased scale and scope we recently acquired, to invest wisely in the business, and to improve our financial flexibility. We remain committed to delivering shareholder value going forward, by improving revenue trends and managing expenses to provide healthy free cash flow and maintain our quarterly common dividend through a sustainable payout ratio."

<u>Financial Highlights for the Fourth Quarter 2016</u>

- Revenue of $2,409 million

- Operating income of $255 million; operating margin of 10.6%

- Net loss attributable to common shareholders of $133 million, or ($0.12) per share, and net loss of $80 million

- Adjusted EBITDA4 of $966 million; Adjusted EBITDA margin5 of 40.0%

- Net cash provided from operating activities of $714 million

- Adjusted free cash flow6 of $316 million

(Footnotes omitted.)

37.    On the same day, February 27, 2017, the Company held a conference call to discuss its financial results. On the call, Defendant McCarthy stated:

We have provided a time line of the account cleanup issue. As you can see, in anticipation of the deal close, Verizon stopped treatment of overdue accounts on February 1, 2016. We continued non-treatment of these accounts through July 20, as we worked through the cut over.

We have been working through the account cleanup process since July 20. We began disconnecting non-paying accounts at the end of August and continued this through Q1. From an accounting standpoint, we began to reserve aging accounts in accordance with our normal policies in Q2 and then increased our reserves, as we discussed on the last earnings call. We began permanent disconnects and receivable write-offs in 3Q, continued them in 4Q and expect to complete them this month.

Turning to slide 6, CTF account cleanup had a $45 million impact on fourth quarter revenue and we estimate less than a $25 million impact in first quarter revenue. We do not expect any further account cleanup impact beyond the first quarter and we're now operating normally with respect to the acquired customer receivable. We completed this cleanup process this month. This was due to the backlog and the specific rules and customer treatment processes dictated by relevant franchising

authorities. We're taking steps to more aggressively manage costs in light of the longer timeframe needed to clean up this account group.

38.    The statements referenced in ¶¶ 24-37 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company acquired a substantial number of non-paying accounts as part of its acquisition of the wireline operations of Verizon Communications, Inc.; (ii) as a result, the Company would be required to increase its reserves, and write-off amounts from accounts receivable associated with the non-paying accounts; and (iii) as a result of the foregoing, Frontier's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

39.    On May 2, 2017, the Company issued a press release entitled "Frontier Communications Reports 2017 First Quarter Results." Therein, the Company, in relevant part, stated:

- Adjusted EBITDA1 of $923 million and quarterly Net Loss of $75 million
- Third sequential quarter of improved FiOS® gross adds in CTF markets
- Resolution of non-paying CTF accounts completed, in line with previous disclosures
- Achieved target of $1.25 billion in total annualized synergies by end of Q1 2017, and remain on track to deliver an additional $350 million by end of Q2 2018
- Board revises capital allocation strategy, including reducing the quarterly dividend to $0.04 per share and accelerating the pace of debt and leverage reduction

<u>Norwalk, Conn., May 2, 2017</u> – Frontier Communications Corporation (NASDAQ:FTR) today reported its first quarter 2017 results, and announced that the Board of Directors has revised the Company's capital allocation strategy, which includes a reduction in the quarterly dividend to $0.04 per share, to enhance

financial flexibility and achieve a targeted leverage ratio2 of 3.5x by year-end 2021, down from the current ratio of 4.39x.

Dan McCarthy, President and CEO, stated, "During the quarter, we continued to realize our targeted efficiencies and synergies, and I am also pleased to have achieved our third consecutive quarter of improved FiOS gross additions in the California, Texas and Florida (CTF) markets. We are executing on a number of initiatives with the goal of enhancing customer experience, reducing churn, stabilizing revenues and generating cash flow.

"Our Board regularly reviews the Company's long-term capital allocation strategy, and it has determined to reduce the dividend at this time to provide additional financial flexibility, while still returning a meaningful cash dividend to shareholders. As we continue to execute on our strategy to deliver on the full potential of our strong assets and generate additional cash flow, we will optimize our capital allocation to ensure we strike a balance between investing in the business, paying down debt and returning capital to shareholders," said McCarthy.

**Business Highlights**

- Frontier achieved a third consecutive quarter of growth in broadband gross additions in its CTF markets, which was driven by the first full quarter of robust marketing

- Overall, consumer churn was elevated during the quarter, and to address this Frontier is investing in a number of initiatives that will improve customer care, retention and acquisition, including:

  o Implementation of Pega® platform underway that will integrate back-office systems to allow Frontier to transform customer experience management, marketing and cost-to-serve

  o Launched e-commerce platform in April to create additional sales channel, improve customer experience and reduce call center volume

  o Expanding network capacity to relieve network congestion

- Increased CAF II households by over 27,000, plus another 82,000 households in adjacent areas

- Completed redeployment of commercial salesforce to align with network and market opportunity

40.    On the same day, May 2, 2017, the Company held a conference call to discuss its

first quarter 2017 financial results. On the call, Defendant McBride stated:

First quarter revenue of $2.36 billion declined $53 million from the $2.41 billion reported in the fourth quarter of 2016. Approximately $16 million of the sequential decline in revenue was a result of the previously disclosed cleanup of CTF non-

paying accounts and the automation of legacy non-pay disconnects. The cleanup and automation processes have now been completed.

*        *        *

Customer revenue of $2.16 billion was down $51 million or 2.3% sequentially from the fourth quarter of 2016. As previously disclosed, first quarter revenue was impacted by the final cleanup of the CTF non-pay accounts and the automation of the legacy non-pay disconnect process. The CTF account cleanup reduced Q1 revenue by $11 million, and the one-time impact related to automating the non-pay disconnect process for the legacy properties, reduced Q1 revenue by $5 million. As stated earlier, these are now complete.

41.    On this news, the Company's stock price fell $4.8 per share, or more than 16%, to close at $24.15 per share on May 3, 2017, on unusually heavy trading volume.

42.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Plaintiff's Class Action Allegations**

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Frontier securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Frontier securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Frontier or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Frontier;

- whether the Individual Defendants caused Frontier to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Frontier securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Frontier  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Frontier securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Frontier securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Frontier securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Frontier securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Frontier's finances and business prospects.

56.    By virtue of their positions at Frontier , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Frontier, the Individual Defendants had knowledge of the details of Frontier's internal affairs.

58.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Frontier.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Frontier's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Frontier securities was artificially inflated throughout the Class Period.  In

27

ignorance of the adverse facts concerning Frontier's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Frontier securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

59.     During the Class Period, Frontier securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Frontier securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Frontier securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Frontier securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

62.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.    During the Class Period, the Individual Defendants participated in the operation and management of Frontier, and conducted and participated, directly and indirectly, in the conduct of Frontier's business affairs.  Because of their senior positions, they knew the adverse non-public information about Frontier's misstatement of income and expenses and false financial statements.

64.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Frontier's financial condition and results of operations, and to correct promptly any public statements issued by Frontier which had become materially false or misleading.

65.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Frontier disseminated in the marketplace during the Class Period concerning Frontier's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Frontier to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Frontier within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Frontier securities.

66.    Each of the Individual Defendants, therefore, acted as a controlling person of Frontier.  By reason of their senior management positions and/or being directors of Frontier, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Frontier to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Frontier and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Frontier.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 19, 2017

Respectfully submitted,

**LEVI & KORSINSKY, LLP**
_/s/ Shannon L. Hopkins_
Shannon L. Hopkins
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone:  (203) 992-4523
Facsimile:  (212) 363-7171
shopkins@zlk.com

_**Attorney for Plaintiff and the Proposed Class**_

**CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Lisa R. Morrow , duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Frontier Communications Corporation which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this October 19, 2017.


Name: Lisa R. Morrow

Signed:

**Schedule A**

Transactions of Lisa R. Morrow in Frontier Communications Corporation (FTR)

| | |
|---|---|
| **Client Name** | Lisa R. Morrow |
| **Company Name** | Frontier Communications Corporation |
| **Ticker Symbol** | FTR |
| **Class Period Start** | 2/6/2015 |
| **Class Period End** | 5/2/2017 |

| Date of Transaction | Puchase or Sale | Quantity | Price per Security |
|---|---|---|---|
| 5/14/2015 | Purchase | 1,538 | $6.4200 |